# EXHIBIT  3

COPY

1

1       UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF CONNECTICUT

2

3   JO LYNN WILSON,

4       PLAINTIFF,

5   VS.                         CIVIL ACTION NO.
                                3:15-CV-00207-DFM

6

7   YALE UNIVERSITY,

        DEFENDANT.

8

9

10      Deposition of JO LYNN WILSON, taken pursuant to

11  Rule 30 of the Federal Rules of Civil Procedure at

12  the Law Offices of John R. Williams, 51 Elm Street,

13  New Haven, Connecticut, by Sabina Lohr, Registered

14  Professional Reporter and Notary Public in and for

15  the State of Connecticut, on March 21, 2016, at

16  1:48 p.m.

17

18

19              SABINA LOHR
                SHR # 0000131

20

21      DEL VECCHIO REPORTING SERVICES, L.L.C.
            PROFESSIONAL SHORTHAND REPORTERS
22                117 RANDI DRIVE
                MADISON, CT 06443
23      (203) 245-9583        (800) 839-6867
                FAX (203) 245-2760

24
    HARTFORD            NEW HAVEN            STAMFORD
25

1              (Defendant's Exhibits 1 through 8 were

2              marked for identification.)

3

4        (A discussion was held off the record.)

5

6        JO LYNN WILSON, having been first duly sworn,

7    was deposed and testified as follows:

8                    DIRECT EXAMINATION

9    BY MR. NOONAN:

10       Q.     Good afternoon.

11              (A telephone call interrupted the deposition.)

12       Q.     First of all, thanks for coming.  We appreciate

13   you making the time available to us.  I'm going to be

14   asking you some questions.  And I'm sure Joe has talked

15   to you about sort of the rules of the road, if you will.

16   But let me mention a couple of things that I think are

17   worth repeating.  First it's important that you

18   understand a question before you start to answer it.  So

19   if you have any hesitation at all about what a question

20   means, just tell me you don't understand it and I'll try

21   to rephrase it in a way that makes more sense.

22       A.     Yes, sir.

23       Q.     Secondly, try not to start your answer before

24   the question is finished.  And I know that sounds

25   obvious.  But many times people know where the question

1   that there was a period of time where you went out on a

2   medical leave from your job with the City of New Haven.

3       A.      When my son got shot in his head and when I had

4   an open heart surgery.

5       Q.      Wow.  And when was that?

6       A.      Which one?

7       Q.      Whichever was first.

8       A.      Well, I had an open heart surgery in '08.

9       Q.      Okay.

10      A.      And then my son was shot in the city of New

11  Haven in '10.

12      Q.      Okay.  And so you were out of work in '08 --

13      A.      Those periods, yeah.

14      Q.      Do you remember how long you were out of work

15  in '08?

16      A.      '08 I was out for about maybe five and a half

17  months.  I tried to go back on a part time, but they

18  said no and then I -- I just went back.

19      Q.      And then in 2010 your son got shot.  How long

20  were you out of work then?

21      A.      I was out of work for like three and a half

22  months because he had multiple surgeries and things like

23  that.

24      Q.      Okay.

25      A.      And again I tried to go back on a part-time

1    from there, you know.  This is a chronic thing that I

2    can't go so much with medication.  So, you know, it's

3    like -- it's like cancer.  You don't have control over

4    it.

5        Q.    Right.  Right.  Okay.  All right.  So were

6    there -- was there any time between -- so in March of

7    2012 you were out for about four and a half months and

8    then went back to work for the City.  Was the next time

9    you were out of work July of 2015 or --

10       A.    Yeah.

11       Q.    -- was there a period in between?

12       A.    Uh-huh.

13       Q.    And who is your doctor that you're seeing in

14   June?

15       A.    Marion Volpe.

16       Q.    And she's a cardiologist?

17       A.    It's the same doctor, Heart Care Associates.

18   It's a male.

19       Q.    Oh, Marion is a male?

20       A.    Uh-huh, Marion Volpe.  And he's been my doctor

21   since '08.  So it hasn't changed or anything.

22       Q.    And you mentioned you still have the reports

23   from him at home?

24       A.    Yes, I have the reports, all my medical.

25       Q.    And could you go those to your lawyer so they

1   can give them to us, give them to him?

2       A.      Yes.  Uh-huh.

3               MR. NOONAN:  And Joe, you don't have any

4   objection to supplying those records?

5               MR. MERLY:  No, I think if they're relevant

6   they'll certainly be supplied.

7       Q.      And do you know how many reports you have at

8   home, medical reports?

9       A.      Well, I have reports back from when they took

10  me out when Yale terminated me and prior to.

11      Q.      Okay.

12      A.      You know, I can get what I can get for you.

13      Q.      I mean do you have a rough number as to how

14  many different ones there are?

15      A.      It's a lot.

16      Q.      Could it be 10 or 15?

17      A.      Yeah, it could be 10 or 15.  It's multiple

18  tests.  Before you can have one test you have to do

19  another test and another one.  It's different tests and

20  different dates but it's all coinciding with, you know,

21  going for procedures and stuff like that.

22      Q.      And you said that at least one of the reports

23  you gave to Yale?

24      A.      Well, a note from the doctor went to Yale.

25      Q.      Okay.  And do you know was that one of the

1   reports you have at home, or was that a different one?

2      A.    Well, I have -- I have reports prior to me

3   going out with Yale, seeing the doctor.

4      Q.    Right.

5      A.    And after.  And, you know, so around the time

6   and after and prior to me actually even going out I was

7   always doing my medical.

8      Q.    Right.

9      A.    That never stopped.

10     Q.    You said before that at least there was at

11  least one report you gave to is your supervisor or

12  someone at Yale?

13     A.    I gave her a note.  Not that I would -- from my

14  primary care doctor that I needed to see my heart

15  doctor.  And they said they never got that note.

16     Q.    All right.  And who -- who do you -- did you

17  give the note to Yale, or did someone else give the note

18  to Yale?  Did it come from the doctor or did it come

19  from you or somebody else?

20     A.    When I gave Yale a note personally myself, and

21  then my husband also brought a note there.

22     Q.    Okay.

23     A.    Because they gave us notes from the

24  Occupational Health.  So they were very much aware and

25  me corresponding with them about me being out of work.

1    A.    Uh-huh.

2    Q.    And you didn't give them anything else; is that

3 right?

4    A.    I gave them a note.  And I'm pretty sure that I

5 gave them both notes.  But just at different times.  And

6 my husband also gave it to them.  Because it's just like

7 a backup, make sure they have it.

8              So I'm pretty sure I gave them the note

9 from every -- both doctors, their doctor and my doctor

10 and then my husband followed up and also gave it to them

11 too because they -- I went there multiple times to

12 Occupational Health, and each time I went they would

13 give me a slip and I would make sure I took it over

14 there or my husband would take it over to be in

15 correspondence with them to let them know I was out.

16 And I was also on the phone with Heather.  So she very

17 much knows that I was out of work.

18    Q.    And when your husband gave a note to Yale, do

19 you know who he gave it to?

20    A.    Heather Howell.

21    Q.    And do you know when that was?

22    A.    The same day, pretty much.  The same day we

23 went to the doctor, the same day.  March 29 they had got

24 a note from both doctors because the notes were dated

25 the same day, 3/29.  3/29 from Occupational Health and

1   3/29 from Dr. Babu Kumar.   Referring me to my heart

2   doctor.

3        Q.     So there were a total of two notes?

4        A.     It was probably four notes, multiple.

5        Q.     Multiple copies of each one?

6        A.     No, multiple copies of the same note but

7   multiple correspondence with different dates coming from

8   Occupational Health, 4/3, 4/4, 4/5.  So every time they

9   gave me -- every time you go and visit them, they give

10  you a slip of what happened.  So on 3/29 a note was

11  given to Heather that I went to primary care, got the

12  note from the doctor, came back, gave that to them the

13  same day, 3/29.

14       Q.     Okay.

15       A.     They got both of those notes that I would not

16  be at work because they ordered me to go to Occupational

17  Health.  Occupational Health told me that I needed to

18  see my primary care doctor.  When I left Occupational

19  Health I went to my primary care doctor because he's a

20  walk-in anyway, you don't even have to have an

21  appointment, and told them that Occupational Health told

22  my need to see him because my blood pressure was really

23  high and they wanted to check -- you know, for me to

24  follow up because whatever he -- and then I needed to go

25  see a primary care doctor.

1        And that's how I got to my primary care

2   doctor, and then he was like you need to see a heart

3   doctor and then it went on and on like that.  And then

4   within two weeks I was terminated.

5       Q.    The -- and so in that two-week period how many

6   times did you go to Occupational Health where you

7   delivered a note to Heather?

8       A.    I went to Occupational Health April 5th, and

9   they said you can't come back, that they didn't accept

10  your claim.  They was like, you know, they wasn't going

11  to keep treatment because nobody was paying them.  So

12  the April 5 was my last day seeing Occupational Health

13  because they -- they had got a denial letter that they

14  wasn't going to --

15      Q.    And so on April 5 was that a date where you

16  were treated or you --

17      A.    I was treated.

18      Q.    And was that -- is there a note from that date?

19      A.    Uh-huh.

20      Q.    And is that something you gave to Heather?

21      A.    Yes, uh-huh.

22      Q.    Were --

23      A.    And all those notes were faxed to them too

24  through Occupational Health.  So whether -- if I didn't

25  give it to them, which I did, they would have gotten it

1    -- city of Hamden.  But it's not a prescription, though,

2    and I think that's what your clients tried to use, that

3    this note was on a prescription pad where I have several

4    notes it's just written on there.  The bottom line, they

5    got the note and they said they didn't get it.

6        Q.    Just so I can get an answer to the question,

7    are these -- is the bottom part of Exhibit 3 a note on

8    the pad from Dr. Kumar?

9        A.    That is a note from Family Internal Medicine

10   from Dr. Kumar, yes, sir.

11       Q.    And then the top part is a business card from

12   Dr. Volpe?

13       A.    That was just copied like that.  It was just a

14   copy like that.

15       Q.    Right.

16       A.    It's a business card, yes.

17             MR. NOONAN:  Okay.  We'll go off the record

18   for a second.

19             (A discussion was held off the record from

20             2:28 p.m. to 2:29 p.m.)

21       Q.    All right.  Exhibit 4 is a copy of the -- I

22   guess it's disability insurance attending physician's

23   statement; is that right?

24       A.    Uh-huh.

25       Q.    And is that -- you have to answer.

1    A.    I'm not sure, but I would have to revisit it.

2  But biggest thing was that they -- my employment -- they

3  would discriminate on my employment.   I mean I'm over

4  40.   I mean I would qualify for that whether I marked it

5  or not.

6    Q.    Okay.

7    A.    Because I'm almost 50, so --

8    Q.    Let me just get the question out.

9    A.    Let me find my paper.   I would have to look at

10 it like you and tell you exactly what I said.

11         MR. MERLY:   Let him just ask whatever his

12 question is and do your best to answer it.   If you need

13 to look at something, so be it.

14   Q.    Do you remember if you in your Crow claim

15 against Yale you also claimed they were biased against

16 you because of a disability?

17   A.    Well, they know I had a heart surgery.

18   Q.    Are you able to answer it yes or no?   Did

19 you --

20   A.    Yeah, I did claim that.

21   Q.    So you claimed age -- do you remember -- you

22 don't remember if you claimed age or not?

23   A.    I'm not sure if I put -- I'm not sure.

24   Q.    What else do you remember putting down?

25   A.    But I put race and I put my disability which

1    one of the things that all of the people in

2    interrogatory one did that discriminated against you

3    because of your age was that a younger person was hired

4    to replace you.  Do you recall that testimony?

5        A.    Yes.

6        Q.    Okay.  Was there anything else that the -- any

7    of the people listed in interrogatory one did other than

8    hire one younger that caused you to believe they were

9    motivated by age discrimination?

10       A.    No.

11       Q.    Let me ask you about physical disability.  You

12   are alleging in this case that you were the victim of

13   discrimination because of physical disability; is that

14   right?

15       A.    Open heart surgery.  Yes.

16       Q.    And let me ask you to just take a look at this

17   document, which is an affidavit of illegal

18   discriminatory practice filed with the Commission on

19   Human Rights and Opportunities.  It's dated October 15,

20   2012.  And is that your signature on page 3?

21       A.    Yes.

22       Q.    And you swore to that under oath; is that

23   correct?

24       A.    Yes.

25       Q.    Okay.  And do you see on page 1 that you made a

1    complaint against Yale in that document for age

2    discrimination, race discrimination and disability

3    discrimination?

4        A.    Yes.

5        Q.    Okay.  Now, with regard to the disability

6    discrimination, what did Heather Howell say or do that

7    caused you to believe that she was discriminating

8    against you because of your disability?

9        A.    She didn't say anything to me.  You got -- but

10   that complaint was filed after they terminated me.

11       Q.    Right.  And in that complaint you allege that

12   Heather Howell -- I'm sorry, you allege that Yale

13   discriminated against you because of physical

14   disability; is that right?

15       A.    Open heart surgery, yes.

16       Q.    Okay.  And did Heather Howell do or say

17   anything to you to cause you to believe that she was

18   discriminating against you because of your physical

19   disability?

20       A.    Well, Heather knew that I was -- that I had a

21   disability.  She knew that I was ill.

22       Q.    Okay.  Is there anything else that Heather

23   Howell did or said that causes you to believe that she

24   was discriminating against you because of your

25   disability?

1   A.   No.   She just knew I had a disability.   And her

2   knowing that and turning around and terminating me I

3   think was -- it was -- it was in just -- it was in just

4   her knowing that prior to me getting sick and falling

5   that prior to me falling and being -- she knew I was

6   sick before I fell.   Let's say that.   She knew I was

7   going, seeing my heart doctor, I was having a stress

8   test.   So she knew that I was having -- and kind of

9   remission with my heart.

10           And I still kept working.   And her

11   knowing that, you know, if she wasn't aware of it that

12   would have been one thing.   But her knowing that I do

13   have a chronic heart condition and that I always worked

14   and then they turn around and ordered me to go to

15   Occupational Health an then terminated me, that to me

16   was premeditated.

17   Q.   Okay.   Is there any other reason beyond what

18   you've said that causes you to think that Heather Howell

19   discriminated against you because of your disability?

20   A.   No.

21   Q.   And let me ask the same thing about Megan

22   Smith.   First of all, do you remember that Megan Smith

23   discriminated against you because of your physical

24   disability?

25   A.   Yes.

1    Q.    Okay.  And what did she do or say that causes

2    you to believe that she discriminated against you

3    because of your physical disability?

4    A.    She knew that I had a heart condition also and

5    she actually -- sorry, the reverse back.  They both knew

6    that I had a heart condition and they both know that my

7    son was shot in the head and they knew that I was just

8    going through, you know, things as a person that, you

9    know, that had caused me stress.

10          And then on top of this falling and

11   being injured, that, you know, that that was, you know,

12   that -- that compiled my illnesses also.  So them

13   knowing that, that's the thing.  Them knowing when they

14   hired me that I had a heart condition and that I could

15   get sick any minute, it was like cancer, you being good

16   one day and then the next day you freaking got to be in

17   a hospital.  So they knew.

18          Them knowing my background, knowing that

19   I'm a hard worker and knowing that I went above and

20   beyond any time, for them to have done that that they

21   know that I was physically unable to work at that time

22   and it was wrong.

23   Q.    Okay.  Is there anything else other than

24   knowing of your physical disability that causes you to

25   believe that Megan Smith discriminated against you

1    talk to me.  No more.  She just kind of dismissed it.

2    It was like washed her hands.  For her to be a professor

3    of that trade, mental health and seeking fed money out

4    for our community mothers and her being a mother and me

5    being a mother, she -- she -- she knew better.

6        Q.    So --

7        A.    She knew it was discrimination.

8        Q.    And how many times did you call Megan Smith

9    after you were terminated that she didn't answer your

10   call?

11       A.    Couple times.

12       Q.    Couple times?

13       A.    Couple times.

14       Q.    All right.  Is there anything else that Megan

15   Smith did or said that caused you to believe that she

16   was discriminating against you because of your physical

17   disability, beyond what you've already told us?

18       A.    Like I said, I'm not -- I'm not sure if it was

19   specifically her, but I think it was between her and

20   Megan, when she plastered --

21       Q.    When you say her and Megan, I was asking about

22   Megan Smith.

23       A.    Heather and Megan.  They plastered their

24   article all over the office and everywhere.  And

25   everybody looks at that article, to me like putting --

1   that I got anxiety.  That's public.  They freaking

2   just -- just pretty much used my situation to publicly

3   put all my personal business out there when that's

4   what -- we wasn't there for that.  We was there to

5   represent what we were trying to do in the city.  I just

6   think it was very -- it was -- it was -- it was -- it

7   was not a good -- it wasn't good because --

8       Q.    Let me ask you about your physical disability

9   that is the subject of this lawsuit.  As I understood it

10  and based on your Crow complaint, you've indicated it

11  was because of your heart condition; is that right?

12      A.    Yes.

13      Q.    Okay.  Did you have an anxiety problem that you

14  thought was causing people to discriminate against you?

15      A.    I had anxiety after my son was hurt, yes.

16      Q.    Okay.  And did you --

17      A.    But I never was treated by -- sorry.  I never

18  was treated by Yale, you know, so I mean some of the

19  information that they had put in that article I don't

20  even know where they got it from, but I just felt like

21  they publicly put that out there, you know.  Then I

22  started having all kind of problems with my city.

23      Q.    In the article -- can you tell me do you have a

24  copy of this article that you're talking about?

25      A.    Uh-huh.

1      A.      I see it.

2      Q.      Do you recall getting any reports from any of

3   your physicians giving a different date for you to

4   return to work?

5      A.      Huh-uh, no.

6      Q.      Okay.  Exhibit 3 I think we already talked

7   about before.  Are you able to read the note at the

8   bottom of the page?

9      A.      Seen today, out of work, until evaluated by a

10  cardiologist.

11     Q.      Okay.

12     A.      Very clear.  Second grader could read it.

13     Q.      All right.  And I think you said that was --

14  I'm forgetting.  Was that one that you personally

15  delivered?  Yes, you did.  You said you gave that to

16  Heather Howell; right?

17     A.      I took the note to Heather Howell and my

18  husband took the note --

19     Q.      Right you both did?

20     A.      -- to Heather Howell.  Because Heather wanted

21  my bag.  So I had a bag.  So she was like could you

22  please bring the bag.  I said to my husband, make sure

23  she gets these notes.  And he took everything and it was

24  no issue.

25     Q.      And when you talked to Heather Howell -- I'm

1    sorry, when you delivered the note of your primary care

2    doctor dated March 29 to Heather Howell, did you have

3    any discussion with her about when you would be coming

4    back to work or when you were planning to see the

5    cardiologist?

6        A.    That's what I -- I told her I will let her know

7    what my date was to see my cardiologist.   And she was

8    like okay.   And it was -- we were -- it was like we'll

9    touch base with each other.   That was it.   And then I

10   got the letter.   It happened so fast --

11       Q.    Did you -- did you talk with Heather Howell at

12   any time after you delivered Exhibit 2 to her and prior

13   to the time --

14       A.    On the phone.   Via phone I did speak with

15   Heather.

16       Q.    Okay.   How many -- how many --

17       A.    About once or twice.

18       Q.    And what do you remember about those

19   conversations?

20       A.    She just asked me how I was doing and that was

21   it.   And that was like I'll be -- I'm seeing a doctor

22   and I'll let you know.

23       Q.    Do you remember when the last time you talked

24   with Heather Howell was?

25       A.    I don't recall the exact day.   But it was --

1    Q.    It was some time --

2    A.    It was definitely right after --

3    Q.    March 29?

4    A.    -- March 29.  Yes.

5    Q.    So within a day or two of the 29th?

6    A.    Yes, we had a conversation.

7    Q.    And do you remember at the time you talked with

8    her was there any discussion during that time as to how

9    long you'd be out of work, or you did not know at that

10   point?

11   A.    I told her that I didn't know.  I would let her

12   know.  I would keep her posted.  Because I had never

13   prior to that -- me being out, I had never missed pretty

14   much a day.  And I worked -- and just for the record, I

15   had worked for them -- I had did an internship for them

16   and I had worked over 90 hours for free for them when I

17   could have been getting paid $19 an hour.

18   Q.    And when did you start working there?

19   A.    December of '10.  December 13 of '10 they hired

20   me.

21   Q.    Okay.

22   A.    As a part time.

23   Q.    That was -- that was considered casual status?

24   A.    Yeah.  Yes.  And then they offered me a

25   full-time job.

1      A.      I never interviewed with those -- those --

2      those two.  But I set up the interview with Heather and

3      she took my resume and everything.  But I can't say she

4      was direct hire because it seemed like our interview

5      with three other people and I guess -- I guess after,

6      you know, they decided.  Because I had never met Megan

7      prior to me ever getting hired.  But I did meet Heather.

8      Q.      Okay.  But Heather wasn't --

9      A.      But Heather wasn't --

10     Q.      -- the interview?

11     A.      No.

12     Q.      Do you know who actually made the decision or

13     not?

14     A.      I'm not sure who made the decision.  But I know

15     Mary Jane Carey and Maria Damiani of the health

16     department, Monio (phonetic) and another, I think they

17     had a -- Diane Rogers was a student, so she sat in on

18     the interviews.  And I went in for the interview, gave

19     my resume and then couple day later they were like you

20     got the job.

21     Q.      Now --

22     A.      Out of 35 people.  So I was like okay.

23     Q.      And when you were applying for the job did you

24     make known your heart condition?

25     A.      Uh-huh, uh-huh.

1    Q.    That's yes?

2    A.    Yes, yes.

3    Q.    And I take it the -- well, I shouldn't assume.

4    Do you know whether the application included your date

5    of birth?

6    A.    The Yale application, yes.

7    Q.    Okay.  And did it include your race, do you

8    recall?  It may not?

9    A.    It probably did.  It probably did.

10   Q.    So you think at the time you were hired people

11   knew of your heart condition, your age and your race?

12   A.    Medical wise when you go through the medical

13   part and they do the -- that part.  I don't think on my

14   application I would have put that I had open heart

15   surgery.  But I think when I went through the medical

16   phase of it and gave my blood pressure and actually when

17   I went through my blood pressure was a little high and

18   she was like ahh.  But I'm going to pass you on through

19   because I guess it was psychiatry's department.  On my

20   application I probably put black.  I probably didn't

21   even put biracial, and probably my age was already up

22   there.  And you had to go through the medical to get the

23   job.

24   Q.    Right.  You needed medical?

25   A.    Yeah, I did indicate that I had an open heart

1    surgery and stuff like that.

2        Q.    And then who made the decision to offer you

3    the, you know, regular full time -- well, not full time

4    but indefinite employment as opposed to casual

5    employment?

6        A.    I'm going to say Megan and Heather, maybe.

7        Q.    Okay.

8        A.    I'm going to say the team.

9        Q.    Okay.  So that --

10       A.    I had worked around so many different people so

11   I had had to be a collaborative like we're going to keep

12   you.  I would think.  I'm not sure.

13       Q.    But I think it likely included Megan and

14   Heather?

15       A.    The team, yeah.

16       Q.    And by that time they certainly were aware of

17   your age, race and your heart condition; correct?

18       A.    Yes.

19       Q.    Now, one of the things you've indicated is that

20   your hourly rate was decreased when you were hired

21   honest a regular basis?

22       A.    (Nods head.)

23       Q.    Were you told that prior to starting that

24   regular job?

25       A.    Oh, yeah, yeah, they did and I was like what?

C E R T I F I C A T E

I hereby certify that I am a Notary Public in, and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting by me, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand as Notary Public this 31st day of March, 2016.

Sabina Lohr
Notary Public

License #0000131
My License Expires December 31, 2016
My Notary Certification Expires July 31, 2017